UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

TINA L. HUTCHINSON,           )
                              )
        Plaintiff             )
                              )
v.                            )   No. 2:13-cv-416-GZS
                              )
CAROLYN W. COLVIN,            )
Acting Commissioner of Social Security, )
                              )
        Defendant             )

### REPORT AND RECOMMENDED DECISION[1]

This Supplemental Security Income ("SSI") appeal raises the question of whether the administrative law judge supportably found the plaintiff capable of performing work existing in significant numbers in the national economy. The plaintiff seeks remand on the bases that the administrative law judge erred in finding her major depressive disorder and borderline personality disorder nonsevere impairments, in failing to give greatest or, at least, substantial weight to the findings of two examining consultants, Karla Diffin, Ph.D., and William M. Barter, Ph.D., regarding her mental residual functional capacity ("RFC"), and in omitting to include, as part of her physical RFC, a need to have unscheduled breaks to wrap and rewrap compression bandages and to move about. *See* Plaintiff's Statement of Errors ("Statement of Errors") (ECF No. 15) at 3-10. I find no reversible error and, accordingly, recommend that the court affirm the decision.

---

[1] This action is properly brought under 42 U.S.C. § 1383(c)(3). The commissioner has admitted that the plaintiff has exhausted her administrative remedies. The case is presented as a request for judicial review by this court pursuant to Local Rule 16.3(a)(2), which requires the plaintiff to file an itemized statement of the specific errors upon which she seeks reversal of the commissioner's decision and to complete and file a fact sheet available at the Clerk's Office, and the commissioner to file a written opposition to the itemized statement. Oral argument was held before me on September 12, 2014, pursuant to Local Rule 16.3(a)(2)(D), requiring the parties to set forth at oral argument their respective positions with citations to relevant statutes, regulations, case authority, and page references to the administrative record.

Pursuant to the commissioner's sequential evaluation process, 20 C.F.R. § 416.920; *Goodermote v. Secretary of Health & Human Servs.*, 690 F.2d 5, 6 (1st Cir. 1982), the administrative law judge found, in relevant part, that the plaintiff had severe impairments of mild degenerative disc disease, mild degenerative joint disease of the left knee, obesity, and lower extremity edema, Finding 2, Record at 14; that she retained the RFC to perform light work, as defined in 20 C.F.R. § 416.967(b), and could lift and carry 10 pounds frequently and up to 20 pounds occasionally, stand/walk for about two hours in an eight-hour workday, and sit for about six hours in an eight-hour workday, but required the opportunity to stand for a few seconds at a time between normal breaks, was able to push/pull within her weight tolerances for lifting/carrying, could never crouch, kneel, crawl, or climb ladders, ropes, or scaffolds, could occasionally climb stairs/ramps, balance, and stoop, and needed to avoid irregular terrain and unprotected heights, Finding 4, *id*. at 17; that, considering her age (43 years old, defined as a younger individual, on the date that she filed her application for SSI benefits, January 25, 2011), education (high school plus one year of college), work experience (transferability of skills immaterial), and RFC, there were jobs existing in significant numbers in the national economy that she could perform, Findings 6-9, *id*. at 21-22; and that she, therefore, had not been disabled since January 25, 2011, Finding 10, *id*. at 23. The Appeals Council declined to review the decision, *id*. at 1-3, making the decision the final determination of the commissioner, 20 C.F.R. § 416.1481; *Dupuis v. Secretary of Health & Human Servs.*, 869 F.2d 622, 623 (1st Cir. 1989).

The standard of review of the commissioner's decision is whether the determination made is supported by substantial evidence. 42 U.S.C. § 1383(c)(3); *Manso-Pizarro v. Secretary of Health & Human Servs.*, 76 F.3d 15, 16 (1st Cir. 1996). In other words, the determination must be supported by such relevant evidence as a reasonable mind might accept as adequate to support

the conclusion drawn. *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Rodriguez v. Secretary of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981).

The administrative law judge reached Step 5 of the sequential evaluation process, at which stage the burden of proof shifts to the commissioner to show that a claimant can perform work other than her past relevant work. 20 C.F.R. § 416.920(g); *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Goodermote*, 690 F.2d at 7. The record must contain substantial evidence in support of the commissioner's findings regarding the plaintiff's RFC to perform such other work. *Rosado v. Secretary of Health & Human Servs.*, 807 F.2d 292, 294 (1st Cir. 1986).

## I. Discussion

### A. Failure to Find Severe Mental Impairments

The administrative law judge noted that he found the plaintiff's affective disorder/major depressive disorder and personality disorder/borderline personality disorder, considered singly or in combination, nonsevere, stating that they had been "managed well with medications" and were "not associated with any severe limitations" and that "[m]ental status examinations in the record [were] within normal limits." Record at 15. In accordance with the commissioner's psychiatric review technique, *see* 20 C.F.R. § 416.920a, he assessed the severity of her mental functional limitations as follows:

> The first functional area is activities of daily living. In this area, the [plaintiff] has mild limitation. In the record, [she] states that she gets her son off to school, does household chores, cares for her own personal needs, takes care of her cat, shops, helps her son with homework, makes dinner, reads, watches television and plays computer games.
>
> The next functional area is social functioning. In this area, the [plaintiff] has mild limitation. She stated in the record that she spends time with others watching television and talking. She interacts daily with her son.

> The third functional area is concentration, persistence or pace. In this area, the [plaintiff] has mild limitation. She is able to watch television regularly, play computer games and help her son with his homework.
>
> The [plaintiff] has not experienced episodes of decompensation which have been of extended duration. The medical record contains no such references.

Record at 15 (citations omitted). He, therefore, concluded that her mental impairments were nonsevere. *See id*.; 20 C.F.R. § 416.920a(d)(1) ("If we rate the degree of your limitation in the first three functional areas as 'none' or 'mild' and 'none' in the fourth area, we will generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities.") (citation omitted).

He also discussed the plaintiff's mental impairments at length in the context of assessing her mental RFC, stating, in relevant part:

> As Dr. Knox [agency nonexamining consultant Thomas Knox, Ph.D.] stated in his July 12, 2011 mental assessment for DDS [Disability Determination Services], the [plaintiff's] anxiety and depression are "well managed" with medications and are not associated with severe limitations. Christine Charest, LMFT, the [plaintiff's] treating therapist at Sweetser since 2008, has provided therapy notes that describe the [plaintiff] as having an agitated mood, feelings of being overwhelmed with responsibilities including her son's special education needs, and relationship issues with her current boyfriend. Ms. Charest's notes essentially document talk therapy with problem-solving, and some [plaintiff] improvement in understanding and dealing with her issues. 2010 to February 2012 progress notes from Tri-County Mental Health Services (TCMHS) also describe problem-solving sessions in addressing [plaintiff] issues of frustration, agitation, dealing with her son's special education needs, and relationship problems.
>
> At the request of Ms. Charest, the [plaintiff] underwent a consultative psychological evaluation on April 12, 2012 with Karla Diffin, Ph.D., and William Barter, Ph.D. The [plaintiff] reported that Ms. Charest is questioning a possible diagnosis of personality disorder. She said that she began working with this therapist when she was her son's provider, and she followed her into her private practice. The [plaintiff] said that she feels she is depressed as evidenced by her proclivity to "fly off in a heartbeat for no reason." When asked about her anxiety, she said that she has symptoms all the time, such as needing to go in and out of a store quickly and leaving if there are too many people. She reported that she is currently in a relationship but "pushes him away." She stated that when she becomes angry she tells him to leave.

With respect to clinical impressions, Dr. Diffin and Dr. Barter noted that the [plaintiff] was well-groomed and pleasant to work with throughout the evaluation. They said that she appeared to understand directions for all tasks that she was asked to complete, and appeared to be oriented to person, place, and time. She was administered the reading subtest of the Wide Range Achievement Test (WRAT-3) and her raw score of 51 indicated an ability to read at the post-high school level.

Dr. Diffin and Dr. Barter jointly opined that the [plaintiff] has borderline personality disorder, often misdiagnosed as bipolar disorder. They opined that, although she likely also meets the criteria for a diagnosis of major depression, borderline personality disorder should be the focus of treatment. They concluded that she does not meet the criteria for a diagnosis of PTSD [post-traumatic stress disorder]. They recommended that [she] participate in dialectical behavior therapy, stating that traditional talk therapy is unlikely to achieve lasting success. They said that medication might be helpful but asserted that "many of the symptoms are likely to persist without specific mental health treatment." The examining psychologists said that the [plaintiff] needs to learn and practice skills for emotional regulation, interpersonal effectiveness, and distress tolerance.

Dr. Diffin and Dr. Barter confirmed a diagnosis of major depressive disorder, recurrent, moderate; borderline personality disorder; and a Global Assessment of Functioning (GAF) of 62. Individuals with this GAF are described as having some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well with some meaningful interpersonal relationships.[2]

\*\*\*

No weight is given to the mental impairment report in Exhibit 15F from Christine Charest, LMFT. The opinion is never entitled to controlling weight. Regardless, the report is internally inconsistent. A GAF of 65 does not equate to marked limitations in activities of daily living, social functioning, and concentration, persistence or pace.

\*\*\*

---

[2] A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed., text rev. 2000) ("DSM-IV-TR"). The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social, and occupational functioning." *Id.* The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 34. A GAF score of 61 to 70 reflects "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.* (boldface omitted).

5

> Some weight is given to the consultative psychological evaluation in Exhibit 14F since it is consistent with the record and documents a GAF of 65.
>
> ∗∗∗
>
> The undersigned finds that the medical records received after the reconsideration are not compelling.
>
> The undersigned gives greatest weight to . . . DDS opinions . . . . [T]he . . . psychological consultants at DDS have reviewed the record to the point of their respective opinions and have demonstrated expertise in assessing impairments and limitations for determining disability under Social Security regulations. Their opinions are supported by the record as a whole.

*Id.* at 19-21 (citations omitted) (emphasis in original).

The plaintiff faults the administrative law judge for failing to explain the weight given to Drs. Diffin's and Barter's findings and opinions, which she argues are consistent with her own allegations and treating counselor Charest's observations, supporting a finding of severe mental impairments. *See* Statement of Errors at 3-7. She notes, *inter alia*, that Drs. Diffin and Barter found, with the benefit of objective psychometric testing, that her mood was likely to be unstable, she had chronic feelings of emptiness, she exhibited inappropriate and intense anger, and at times she was likely to exhibit stress-related paranoid thinking and even dissociative symptoms. *See id.* at 4; Record at 1117.

She points out that the administrative law judge did not dispute these findings, instead underlining Drs. Diffin's and Barter's statement that she needed to learn and practice skills for emotional regulation, interpersonal effectiveness, and distress tolerance. *See* Statement of Errors at 5. She contends that the "[t]he result of [her] lack of such necessary functional skills is that [she] is significantly limited in her ability to do basic work activities." *Id.* at 6-7. She adds that the activities of daily living to which the administrative law judge points, such as watching television, caring for her son, and playing computer games, do not conflict with her allegations

6

that she cannot consistently regulate her moods, be effective in interpersonal interactions, and tolerate distressing situations. *See id*. at 6.[3]

It is not clear why the administrative law judge underlined the above passage from the Diffin and Barter evaluation, which seemingly signaled a desire to emphasize it. Nonetheless, I find no error.

First, as counsel for the commissioner notes, *see* Defendant's Opposition to Plaintiff's Statement of Errors ("Opposition") (ECF No. 16) at 9, the Barter/Diffin evaluation is not a "medical opinion," that is, an opinion as to "the nature and severity of [a claimant's] impairment(s), including [his or her] symptoms, diagnosis and prognosis, what [the claimant] can still do despite [his or her] impairment(s), and [his or her] physical or mental restrictions[,]" 20 C.F.R. § 416.927(a)(2). The statement that the administrative law judge underlined does not identify any specific restrictions in the plaintiff's functioning or clarify the severity of her impairment. As counsel for the commissioner noted at oral argument, anyone presumably could benefit from learning and practicing skills for emotional regulation, interpersonal effectiveness, and distress tolerance.[4]

---

[3] At oral argument, the plaintiff's counsel also disputed the administrative law judge's finding at Step 2 that his client's mental status examinations were normal, stating that, from his review, it appeared that all of the mental status examinations of record, including those of Drs. Diffin and Barter and treating counselor Charest, recorded abnormal results. He pointed, for example, to a May 7, 2009, mental status examination by Charest finding the plaintiff unkempt, agitated, irritable, depressed, and anxious, *see* Record at 533, and a May 9, 2008, mental status examination by Charest assessing her as depressed, irritable, agitated, and tense, *see id*. at 579. Yet, the "Clinical Impressions" portion of the Diffin/Barter report fairly can be characterized as within normal limits: the plaintiff was noted to be well-groomed, pleasant, to understand directions, and to be oriented to person, place, and time, *see id*. at 1115, and Charest recorded a number of normal as well as abnormal findings, *see id*. at 533-34, 579-80. In any event, any error in characterizing all mental status examinations of record as normal is harmless. Even though some evidence of record supports a finding of severe mental impairments, for the reasons discussed below, substantial evidence supports the administrative law judge's finding that those impairments were nonsevere.

[4] The plaintiff also argued that administrative law judges should be required to provide good reasons for the weight given to examining sources' opinions, as they must in the case of treating sources. *See* Statement of Errors at 5-6. As the commissioner points out, *see* Opposition at 8-9, this court has ruled otherwise, *see, e.g., Tompkins v. Colvin*, No. 1:13-CV-73-GZS, 2014 WL 294474, at *3 (D. Me. Jan. 27, 2014) ("A onetime examining consultant is not a 'treating source' and therefore is not subject to the 'treating source' rule, pursuant to which a medical opinion may be rejected only for good reasons.") (citation and internal quotation marks omitted).

Second, as the commissioner argues, *see* Opposition at 5-8, the administrative law judge supportably deemed the plaintiff's mental impairments nonsevere on the basis of a combination of factors, including her activities of daily living, the GAF scores assessed by Charest and Drs. Diffin and Barter, and the Knox opinion. The Knox opinion directly supports the finding of nonsevere limitations. *See* Record at 91. The plaintiff's activities of daily living reasonably could be viewed as inconsistent with her allegations; for example, despite her allegations of disabling social limitations, she indicated in her function report that she talked and watched television with others on a daily basis. *See id.* at 221. And the GAF scores of 62 assessed by Drs. Diffin and Barter and 65 assessed by counselor Charest are consistent with mild symptoms or functional limitations. *See id*. at 1118-19; DSM-IV-TR at 34. As the commissioner observes, *see* Opposition at 8, "in situations where the individual's symptom severity and level of functioning are discordant, the final GAF rating always reflects the worse of the two[,]" DSM-IV-TR at 33. Thus, the plaintiff's functioning was, at most, rated as mildly impaired on those occasions.

Third, although overlooked by both the plaintiff and the commissioner, the administrative law judge did explain the weight given to the Diffin/Barter findings. He stated that he gave "[s]ome weight" to Exhibit 14F (the Diffin/Barter report) "since it is consistent with the record and documents a GAF of 65." Record at 21. While the administrative law judge mistakenly described Drs. Diffin and Barter as documenting a score of 65 (rather than 62), *compare id*. at 1118, nothing turns on the error. As discussed above, both scores are consistent with mild symptoms or functional limitations.

### B. Handling of Diffin/Barter Report

In a related vein, the plaintiff next faults the administrative law judge for failing to explain why he seemingly gave the Diffin/Barter report no weight despite having "clearly determined that

8

Drs. Diffin's and Barter's opinion that the Plaintiff lacked the skills for emotional regulation, interpersonal effectiveness, and distress tolerance was an accurate assessment because he underlined that opinion in his Decision." Statement of Errors at 8 (citation omitted). She posits that, without learning these skills, she lacks "the emotional stability to effectively and appropriately handle the stress and interpersonal interactions in the workplace on a sustained basis." *Id*. at 7.

She notes that, to the extent that the administrative law judge relied on GAF scores, the American Psychiatric Association discarded GAF scoring in the latest edition of the Diagnostic and Statistical Manual. *See id*. at 7-8; *see also* American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 16 (5th ed. 2013) ("DSM-V") ("It was recommended that the GAF be dropped from DSM-5 for several reasons, including its conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice.").[5]

As the commissioner rejoins, *see* Opposition at 9-10, Drs. Diffin and Barter did not offer a "medical opinion." They did not translate their finding that she needed to learn and practice certain skills into an assessment that her function was restricted in any particular manner or to any particular degree. It is not clear why the administrative law judge underscored a portion of their report; however, his underscoring cannot fairly be characterized as an indication that he subscribed to the notion that the plaintiff had severe mental functional restrictions.

Nor was the administrative law judge's partial reliance on assessed GAF scores misplaced. The commissioner correctly notes that the DSM-V was not released until 2013, after Drs. Diffin

---

[5] The plaintiff also contended, in her statement of errors, that Dr. Knox's RFC opinion was necessarily incomplete and could not be relied on by the administrative law judge because he did not identify her borderline personality disorder as a medically determinable impairment. *See* Statement of Errors at 8. However, at oral argument, her counsel stated that he did not believe it was significant that Dr. Knox lacked this diagnosis when rendering his opinion.

9

and Barter issued their report. *See* Opposition at 10-11. The administrative law judge committed no error in taking into account scores produced pursuant to the then-operative assessment rubric.

Finally, as noted above, the basic premise that the administrative law judge did not explain the weight given to the Diffin/Barter findings is incorrect. He stated that he gave the report some weight, noting that it documented a GAF score indicative of a mild level of symptoms. *See* Record at 21.

### C. Omission of Need for Certain Types of Unscheduled Breaks

The plaintiff finally faults the administrative law judge for failing to include, in his physical RFC determination, a need for the plaintiff, between normal breaks, not only to change from sitting to standing but also to move about, and to take unscheduled breaks for five to 10 minutes to rewrap the compression bandages on her lower extremities. *See* Statement of Errors at 9. She contends that these restrictions are supported by the testimony at hearing of medical expert William Hall, M.D., whose opinions were given great weight by the administrative law judge. *See id.* She points to the following colloquy at hearing between her counsel and Dr. Hall:

> Q . . . Do you agree with Dr. Dal[]y [Chrystalla Daly, D.O.], which is Exhibit 2A, that [the plaintiff] has edema from [v]en[o]us stasis/lymphatics?
>
> A    I do.
>
> Q    Okay. Would you agree that consistent with that finding, that her testimony that she would need changes in posture – regular changes in posture to relieve swelling consistent with that observation by Dr. Dal[]y?
>
> A    I do.
>
> Q    Okay. And would it be consistent with Dr. Dal[]y's statement and consistent with your testimony that she would at times need to, in changing postures, to move as well as to stand from sitting?
>
> A    I do.

Record at 67. Dr. Hall further agreed that wraps are standard treatment for lymphedema (in addition to support hose) and that it can take five to 10 minutes to wrap the lower extremities. *See id*. at 67-68. He stated that certain people might be instructed to wrap their lower extremities more than once a day, but that is not necessarily the case. *See id*. at 69.

The plaintiff's counsel then asked the vocational expert present at hearing, "if we . . . change [the administrative law judge's] hypothetical to the individual not just getting up every few seconds in an hour from a seated position, but we changed that to having to [get up] every hour or every two hours for 15 minutes and move around . . . [t]hat is, move away from the work location or work station, would that rule out the jobs that you've identified?" *Id*. at 73. The vocational expert stated that it would. *See id*. The plaintiff, therefore, contends that the omissions she complains of were not harmless. *See* Statement of Errors at 10.

However, as the commissioner points out, *see* Opposition at 12, Dr. Hall never testified that the *plaintiff* needed unscheduled breaks during the workday to wrap compression bandages, *see* Record at 69, and there is no evidence from the plaintiff herself that she would need to wrap bandages more than once a day. She indicated that she wrapped her legs with compression bandages once or twice per week on average, when she had no clean and dry compression stockings available. *See id*. at 45. In addition, as the commissioner observes, *see* Opposition at 14, Dr. Hall did not indicate that the need to move would lengthen the plaintiff's standing breaks beyond a few seconds, *see* Record at 67. Thus, the plaintiff fails to demonstrate that any error in omitting a need to move about during breaks was prejudicial.

## II. Conclusion

For the foregoing reasons, I recommend that the decision of the commissioner be **AFFIRMED**.

11

## NOTICE

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen (14) days after being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 21st day of October, 2014.

/s/ John H. Rich III
John H. Rich III
United States Magistrate Judge